# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| FREDRIC TYLER PELHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:14-CV-1601 |
| ) | Judge Aleta A. Trauger |
| ) | |
| UNIPRES U.S.A., INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Defendant Unipres U.S.A., Inc. ("Unipres") has filed a Motion for Partial Summary Judgment ("Motion for Summary Judgment") (Docket No. 25), to which plaintiff Fredric Tyler Pelham ("Pelham") has filed a Response in opposition (Docket No. 33), and Unipres has filed a Reply (Docket No. 38). For the following reasons, the motion will be denied.

## FACTS AND PROCEDURAL BACKGROUND

This case involves allegations by Pelham that Unipres (1) failed to properly pay him wages due under the Fair Labor Standards Act ("FLSA") and (2) retaliated against him by terminating his employment after he complained about the unpaid wages.[1] Unipres is a Tennessee corporation with a principal place of business in Sumner County, Tennessee, that does business in Rutherford County, Tennessee. Pelham is a resident of Rutherford County, Tennessee.

---

[1] Facts are drawn from Unipres' Statement of Undisputed Material Facts (Docket No. 27), Pelham's Response thereto ("RSUMF") and Additional Disputed Material Facts for Trial (Docket No. 32), and Unipres' Response to Plaintiff's Additional Material Facts ("RAMF") (Docket No. 36).

1

Unipres manufactures automotive parts at facilities in Tennessee. Most of Unipres' approximately 1,320 employees work in Nissan North America, Inc.'s ("Nissan") Supplier Park ("NSP"), although a few Unipres employees work inside the Nissan plant ("Nissan Facility") itself. Performing work for Nissan represents over ninety percent of Unipres' business. Pelham first became a Unipres employee on June 8, 2014; he worked as an assembly technician at the NSP. Pelham was to be a probationary employee during his first ninety days of employment at Unipres.

Pelham's supervisor was Light on Simpson ("Simpson"), an Area Manager for Unipres. Simpson reported to Steve Hammond ("Hammond"), the local site manager for Unipres. Antoinette Owens ("Owens") was the local Unipres human resources officer. Unipres provided all of its employees, including Pelham, with an Employee Handbook at the time of hire. The Employee Handbook, *inter alia*, summarized Unipres' Code of Conduct and set forth Unipres' expectations for its employees, as well as Unipres' progressive discipline policy. In the Employee Handbook, Unipres stated that, "while it will follow progressive discipline in most situations, it reserves the right to terminate an employee in accordance with his or her employment-at-will status without prior warning and without notice." The Code of Conduct stated that there are "violations that are so serious as to be cause for immediate discharge." Unipres' F.R.C.P. 30(b)(6) corporate designee, Tanya Whitney, testified that Unipres does not apply its progressive discipline policy to probationary employees but, under examination by Pelham's counsel, she conceded that there have been instances in which Unipres has done so.

Nissan had its yearly two-week plant break in the summer of 2014. Nissan asked Unipres to assist in staffing the Nissan Facility so that the line could keep operating during this period.

Unipres asked for volunteers to work in the Nissan Facility; Pelham volunteered and was chosen to work. Pelham worked three eight-hour shifts in the Nissan Facility between June 30, 2014 and July 2, 2014 (the "Facility Shifts"). However, Pelham was not paid when he expected to be for that work.

Pelham complained to Simpson multiple times – every day for approximately two weeks – about his missing wages. Simpson became angry with Pelham because of his numerous and repeated complaints about not being paid for the work performed on the Facility Shifts. Pelham also complained to Owens and Unipres' corporate office about the fact that he had worked without being paid. After Pelham's complaints to Simpson, Pelham asserts that Simpson's attitude toward him changed. Simpson seemed displeased with Pelham and stopped talking to him at all. According to Pelham, Simpson seemed as if he wanted Pelham "not there anymore." When Pelham told Simpson that he was going to "call corporate," Simpson said, "do what you have to do" and walked away; Simpson did not speak to Pelham again.[2]

On July 16, 2014, Pelham reported for work at the NSP. Pelham once again complained about having not been paid for the Facility Shifts. Less than three hours later, Simpson sent an email to Owens advising that Pelham had not been paid for the Facility Shifts and listed the times that Pelham had worked on those days. After receiving this email, Owens submitted a request to Unipres' payroll department requesting pay for the additional time indicated by Simpson, and Pelham was paid for 15.25 of the hours worked in his next scheduled pay period. Pelham does

---

[2] Unipres explicitly does not dispute the facts contained in this paragraph for purposes of this motion, despite "adding" the testimony of Simpson that he "was not upset in any way with Mr. Pelham for advising that [he] had not been paid for his work performed [on the Facility Shifts.]" *See* RAMF Nos. 8, 10, 11, 12.

not now dispute that he was paid for 15.25 hours, but he claims that this was not remuneration for "the full time he worked for the defendant" during the Facility Shifts.[3] *See* RSUMF No. 20.

On the evening of July 16, 2014, Pelham was tasked with working at the Nissan Facility to repair parts previously manufactured by Unipres that Nissan had complained its robots could not retrieve. Simpson drove Pelham to the Nissan Facility and instructed him to use a drill to enlarge holes on certain parts that needed to be re-worked. Pelham was the only employee whom Simpson assigned to this task. Simpson did not tell Pelham who would supervise him, and Pelham did not know. Simpson did not tell Pelham how he was to take the breaks to which he was entitled (*i.e.*, a ten-minute paid break before lunch, a thirty-minute unpaid lunch break, and a fifteen-minute paid break after lunch) and Pelham did not know. Pelham asked the Nissan employees stationed near him when they took their breaks, and they told him that they would send someone over to relieve him for his breaks because the assembly line did not stop.[4] Pelham commenced work, and the time for his first break (the ten-minute pre-lunch break that should have been around 8:15 p.m.) passed with no relief person appearing. Pelham continued to work, and, at approximately 11:00 p.m., someone informed Pelham that another employee would come by in fifteen to twenty minutes to relieve him for his lunch break. Fifteen minutes later, a female Nissan employee arrived and told Pelham that she was there to relieve him for his lunch break.

---

[3] This payment is the subject of Pelham's first claim in this action, which is not at issue in this motion. Discovery in this action has revealed that Pelham was indeed paid for 15.25 of the twenty-four hours, and wages for only 8.75 hours remain in dispute. Regardless, this issue is not material to Unipres' Partial Motion for Summary Judgment on the second count of the Complaint.

[4] The facts in the record do not reveal whether Pelham's earlier stint working at the Nissan Facility was on the assembly line and whether he had been given guidance on that occasion about supervisors and breaks.

4

Pelham has testified that he did not exceed his allowed thirty-minute unpaid lunch period. Unipres disputes this fact. Unipres relies upon statements of Michael Harris ("Harris"), the Unipres Area Manager working at the Nissan Facility on the shift at issue, and Tom Stevenson ("Stevenson"), a Unipres line lead also working at the Nissan Facility at the same time, gathered during its internal investigation. Harris submitted a statement recounting that Pelham had taken an "unauthorized" lunch break from 11:15 to 11:45, after seeking relief from a Nissan employee, and had to be asked to return to the line. (Docket No. 25-3.) Stevenson submitted a statement explaining that Pelham was supposed to return from his lunch break at 11:35 but did not timely do so. *Id.* Stevenson said he found Pelham "sitting on a picnic table and cutting up with a couple Nissan employees" at 11:45, and, when questioned by Stevenson, Pelham "jumped up, nervously put his gloves on and walked back into the building." *Id.*

When Pelham returned to his station, he worked until his drill bit broke. According to his testimony, Pelham did not know where to get a replacement drill bit, so he began asking Nissan employees. The Nissan employees told Pelham to find his Unipres supervisor, but they did not tell Pelham where to locate him. After walking around and looking for his supervisor, Pelham used his cell phone to call Simpson. Simpson brought Pelham a new drill bit approximately twenty-five minutes later.

Pelham returned to drilling. At approximately 3:00 a.m., Pelham's drill malfunctioned, lost power, and had to be replaced; he approached nearby Nissan employees, and they helped him secure a replacement drill. Unipres does not dispute these facts for purposes of summary judgment. *See* RAMF No. 23. However, the statement submitted by Harris to Unipres during its investigation recounted that Pelham had taken an "unauthorized" break around 3:00 a.m. that "resulted in down time for Nissan." *See* RAMF Nos. 19, 25. (Docket No. 25-3.)

At approximately 4:30 a.m., Unipres sent Pelham home for taking an "unauthorized" break. A supervisor named Richard Brown ("Brown") drove Pelham back to the NSP. Pelham has testified that Brown told him that Simpson had been mad at Pelham about the paycheck complaint, and that now Simpson was even madder. *See* RAMF No. 26. Pelham waited for Owens to arrive at work to ask her what was happening. Pelham asked Owens if she would at least get his side of the story, and she assured him that there would be a time and place for that. However, neither Owens nor anyone else at Unipres asked Pelham for his explanation about what happened at work that prior evening. Owens did not discuss Pelham's complaints regarding the Facility Shifts wage issue with him either.

During the morning of July 17, 2014, Nissan reported to Unipres that it experienced a six-minute shutdown of the line upon which Pelham was working. Owens suspended Pelham without pay until such time as Unipres investigated his alleged taking of unauthorized breaks during the July 16-17 shift worked and its relationship to the six-minute shutdown at the Nissan Facility. Pelham had previously been informed by Unipres that causing a shutdown of the Nissan line was "a very bad thing to do." Indeed, causing a shutdown of the Nissan line places at risk Unipres' important business relationship with Nissan. Nissan charges Unipres a monetary penalty for each minute that a shutdown occurs due to the actions of Unipres or its employees. Pelham agrees with Unipres that Nissan identified the cause of the line shutdown as the part on which he had been working. According to Unipres, Tanya Whitney ("Whitney"), Unipres' Human Resources Manager, recommended the termination of Pelham to Owens and Hammond, "based on the fact that [Pelham] was in his probationary period, had taken excessive breaks, unauthorized breaks, and shut down Nissan." On July 21, 2014, Unipres terminated Pelham and submitted a separation notice to the State of Tennessee that stated Pelham had been terminated

6

effective July 17, 2014, due to his job performance in probationary period. Neither Hammond nor Whitney was aware of Pelham's complaints regarding payment for the Facility Shifts until after Unipres had terminated Pelham; Owens and Simpson were aware of the complaints prior to Pelham's termination.

On August 5, 2014, Pelham filed the Complaint (Docket No. 1), which Unipres answered on September 5, 2014 (Docket No. 6). With permission of the court, Unipres filed its Partial Motion for Summary Judgment on May 21, 2015 on Pelham's claim of FLSA retaliation. (Docket No. 25.) Pelham filed his Response on June 16, 2015. (Docket No. 33.) On June 25, 2014, Unipres filed its Reply. (Docket No. 38.)

## **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

### I. Standard for Retaliation Claims Under Fair Labor Standards Act

The FLSA proscribes retaliation by "discharg[ing]" or otherwise "discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act." 29 U.S.C. § 215(a)(3) (2010); *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. A'ppx 524, 532 (6th Cir. 2011). Claims of FLSA retaliation are analyzed under the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dept. of Cnty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). Under the *McDonnell Douglas* framework, Pelham must first establish a *prima facie* case of retaliation under the FLSA. To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) he engaged in protected activity under the FLSA; (2) his exercise of this right was known by his employer; (3) his employer took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Adair*, 452 F.3d at 489. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Macy v. Hopkins County Sch. Bd.*

8

of Educ., 484 F.3d 357, 364 (6th Cir. 2007). To meet this burden, a defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007); *Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008). If the defendant is successful, the burden then shifts back to the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Macy*, 484 F.3d at 364; *see also Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (noting that the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against him).

## II. Pelham's FLSA Retaliation Claim

## I. Protected Activity

As an initial matter, Unipres contends that Pelham did not engage in a "protected activity" that would entitle him to protection under the FLSA.

The Supreme Court has held that a "complaint" is filed with an employer under the FLSA when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the FLSA. *Kasten v. Saint-Goban Performance Plastics Corp.*, 131 S.Ct. 1325, 1335 (2011). The fair notice does not necessarily have to be in writing. *Id.* The complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection. *Id.*

The court finds Unipres' position to be untenable. Unipres acknowledges that Pelham complained to Unipres "every day" for two weeks that he had "still not gotten paid" his

federally-mandated minimum wage for the Facility Shifts. *See* RAMF Nos. 7, 9. Pelham made these complaints to his supervisor (Simpson), Unipres' human resources officer (Owens), and Unipres "corporate." *Id.* Unipres has also acknowledged that Unipres personnel were aware of Pelham's complaints. *See* RAMF Nos. 8, 11, 12. This is sufficient to establish that Unipres understood Pelham was making "an assertion of rights protected by the FLSA and a call for their protection." *Kasten*, 121 S. Ct. at 1335.

## II. <u>Causal Connection</u>

Unipres next argues that Pelham is unable to show a causal connection between the protected activity and the adverse employment action.

In order to establish a causal connection between the protected conduct and the adverse action, a plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the adverse action would not have occurred but for his engagement in protected activity. *Dye v. Office of the Racing Commc'ns*, 702 F.3d 286, 205 (6th Cir. 2012); *Russell v. Kloeckner Metals Corp.*, No. 3-13-0316, 2014 WL 1515527, *3 (M.D. Tenn. Apr. 18, 2014). In this context, "but for" has been interpreted to mean having a "close relationship." *Taylor v. City of Gatlinburg*, No. 3:06-cv-273, 2008 WL 4057805, at *4 (E.D. Tenn. Aug. 26, 2008); *Shelton v. Techpack Am. Inc.*, No. 2:10–CV–89, 2011 WL 1813975, at *7 (E.D. Tenn. 2011).

A causal link can be shown through direct or circumstantial evidence, including by showing temporal proximity between engaging in protected activity and suffering an adverse employment action. If the protected activity and adverse action are very close in time, then a

showing of temporal proximity alone can be sufficient.[5] *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation.") (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)); *Doe v. Rutherford Cnty., Tenn., Bd. of Educ.*, No. 3:13:-cv-328, 2014 WL 4080163, at *18 (M.D. Tenn. Aug. 18, 2015); *Russell*, 2014 WL 1515527 at *3. If temporal proximity is lacking in strength, the Sixth Circuit has stated that combining it with other evidence of retaliatory conduct is enough to establish a causal connection. *See Montell*, 757 F.3d at 505 (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (noting that "[t]here are . . . circumstances where temporal proximity, considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection")). Generally speaking, however, "the [ ] *prima facie* burden to show a causal connection (among other elements) is a burden that is relatively 'easily met.'" *Rutherford County*, 2014 WL 4080163 at *18 (citing *McClain v. Nw. Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 335 (6th Cir. 2006)).

Here, Pelham complained about his unpaid wages every day for two weeks and – most

---

[5] Unipres contends that temporal proximity alone is not enough to establish a causal connection for a retaliation claim. However, Unipres does not address the recent Sixth Circuit *Montell* decision, which addresses this issue by (1) citing *Mickey,* (2) reconciling two lines of cases (some of which had previously suggested that temporal proximity alone was not enough, and some of which had suggested that temporal proximity alone could be enough), (3) explaining why the two strands had appeared to diverge, and (4) making clear that temporal proximity can be sufficient in appropriate circumstances. *See Montell*, 757 F.3d at 505.

11

importantly – immediately before he was assigned to work an unfamiliar task at the Nissan Facility that gave rise to the purported basis for Unipres' adverse action against him. Given the immediate temporal connection between (1) Pelham's complaints, (2) Unipres' suspension of Pelham mere hours after the Nissan Facility shift at issue, and (3) Unipres' termination of Pelham shortly thereafter, Pelham has sufficiently established a case that his complaints had a direct bearing on his termination.

Pelham's testimony concerning (1) Simpson's growing anger towards only him, (2) Brown's comments echoing the same, and (3) Pelham's sudden assignment to a new line position, without any information as to the identity of his supervisors or the proper mechanisms for taking breaks, provides additional evidence of disparate treatment that supports Pelham's case for causation. *See, e.g., Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 533-34 (6th Cir. 2011) (citing *Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105-06 (6th Cir. 2005) (noting that an example of sufficient additional evidence of causation can be disparate treatment in various forms)). In short, Pelham has met his *prima facie* burden of establishing that his protected activity bore a causal connection to Unipres' adverse action. *See, e.g., Montell,* 757 F.3d at 506 (finding plaintiff met burden for causal connection when the protected activity occurred one day and the next day the plaintiff was presented with an ultimatum to quit or be fired); *Pettit,* 429 F. App'x 524, 533-34 (6th Cir. 2011) (finding plaintiff met burden for causal connection where she was given an unfavorable contract four days after engaging in protected activity, thus creating an inference of retaliation through temporal proximity, and was treated differently from certain other employees in certain limited ways).

III. **Legitimate Non-Discriminatory Reason**

Once Pelham has made a *prima facie* case of retaliation, the burden shifts to Unipres to proffer a legitimate non-discriminatory reason for his termination. As discussed *supra*, Unipres has proffered the explanation, supported by evidence gathered in an internal investigation, that Pelham was terminated for taking unauthorized breaks that resulted in a six-minute shutdown of the Nissan Facility line. Unipres asserts that the termination was appropriate because the Nissan Facility line shutdown caused great problems between Unipres and its – by far – most important client. Furthermore, Unipres highlights that Pelham was a probationary employee who had been advised of (1) the importance of the work for Nissan and (2) warned that he was not necessarily entitled to progressive discipline for serious infractions. Pelham does not argue that Unipres' proffered reason is illegitimate.

## IV. Pretext

The burden then shifts back to the plaintiff. At the final stage of the *McDonnell Douglas* inquiry, the burden of production requires the plaintiff to prove the employer's proffered reasons for its adverse actions against the employee were, in fact, pretext for retaliation. Pelham must therefore establish that these stated reasons are pretext by producing "enough evidence to . . . rebut, but not to disprove [Pelham's] proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014) (internal quotation marks omitted). He may do this by showing that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate Unipres action, or (3) the proffered reason was insufficient to motivate the action. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Pelham argues the first of these

13

possibilities – *i.e.*, that Unipres' proffered reason for his termination has no basis in fact.[6] Unipres, on the other hand, maintains that it had an "honest belief" in its nondiscriminatory reason for firing Pelham, namely that it conducted an investigation that concluded Pelham had taken an "unauthorized" break that caused the Nissan Facility line upon which he was working to shut down for six minutes at approximately 3:00 a.m. on July 17, 2014, injuring the relationship between Unipres and its client Nissan.

Under what is known as the "honest belief" doctrine, Unipres may avoid a finding that its claimed nondiscriminatory reason was pretextual if it establishes that it "reasonabl[y] reli[ed] on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006); *see also Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (citation and internal quotation marks omitted). An employer's claim of honest belief is tied to the nature of its investigation and decision-making process. *Tingle*, 692 F.3d at 531. Unipres must show that it relied upon particularized facts and made "a reasonably informed and considered decision before taking the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Unipres does not enjoy this protection if Pelham adduces evidence sufficient to allow a jury to reasonably reject Unipres' explanation and conclude that Unipres failed to make a reasonably informed and considered decision in

---

[6] If Pelham were to argue the second, he would have to contend that other employees were not fired, even though they engaged in substantially the same conduct. *See Jones v. Unipres, U.S.A., Inc.*, No. 3:12-cv-1089, 2013 WL 5782930, at *11 (M.D. Tenn. Oct. 28, 2013). If Pelham were to argue the third, he would have to essentially admit the factual basis underlying the employer's explanation and that such conduct could motivate dismissal, but present further evidence that the employer was actually motivated by illegal reasons. *Id.* Pelham has pursued neither avenue. (*See generally* Docket No. 33.)

terminating Pelham. *Yazdian v. Conmed Endoscopic Technologies, Inc.,* No. 14-3745, ---- F.3d -
---, 2015 WL 4231, at *15 (6th Cir. Jul. 14, 2015) (recommended for publication); *Wright*, 455
F.3d at 708.

Pelham has testified to a different version of events than that which has been put forth by
Unipres as a result of its internal investigation. Pelham has essentially argued that, after
becoming angered by Pelham's wage complaints, Simpson "set up" Pelham for negative
consequences by creating a situation in which Pelham would fail while servicing Unipres' critical
client – namely, by assigning Pelham to an important, unfamiliar task without informing him of
the identity of his supervisors or the mechanism for taking breaks. Pelham has testified that he
took no unauthorized breaks and that there is no basis in fact to support Unipres' proffered reason
for terminating him. Pelham has further testified that, other than a legitimate lunch break, where
he was relieved by a Nissan employee, he only left his post on the line when his equipment failed
and he needed to obtain repairs or replacements. This alternative version of underlying events
alone, however, does not negate Unipres' honest belief, because it does not cast sufficient doubt
upon whether Unipres reasonably relied on the particularized facts before it. *See Seeger v.
Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

However, Unipres has also made factual concessions about its investigation that create
doubt as to the particularized facts upon which it relied to reach its "honest belief" about what
occurred on July 17, 2014. According to Unipres, upon learning about the Nissan Facility line
shutdown on the morning of July 17, 2014, Simpson sent Pelham home, and Unipres conducted a
rapid investigation into the incident, which involved Owens interviewing four people (Simpson,
Hammond, Harris, and Stevenson), and taking one-page statements from two of them (Harris and

15

Stevenson), who stated that Pelham had taken "unauthorized" breaks from the Nissan Facility line. Harris's statement in particular reported that Pelham had "taken it upon himself" to "just walk[ ] off the line" for an "unauthorized break "around 3:00 a.m.," resulting in "down time" for the Nissan Facility line. Unipres contends that it relied upon these facts, combined with the fact that Nissan identified that its line had been stopped at around the same time, to make a "reasonably informed and considered decision" to terminate Pelham for misbehavior.

But Unipres also does not dispute the fact that, at 3:00 a.m. on July 17, 2017, Pelham's drill broke, and he was in the process of securing replacement equipment from nearby Nissan employees. *See* RAMF No. 23. This is an alternative, equally plausible reason for the Nissan line to have gone down for six minutes around 3:00 a.m., and it is not attributable to Pelham's delinquency. This admission leads to other questions of disputed fact concerning the events of that morning, including whether what occurred at 3:00 a.m. was "authorized" or not, and raises factual issues about the veracity of Harris's statement. Stated differently, if Unipres does not dispute that Pelham's drill broke at 3:00 a.m., this raises a triable question of fact as to whether Unipres reasonably relied on the particularized facts of an adequate investigation in reaching an honest belief that Pelham was acting in an "unauthorized" manner at 3:00 a.m. and thus deserved to be terminated for that reason. This question as to the factual predicate of Unipres' honest belief is enhanced by the fact that Unipres also acknowledges it did not even seek Pelham's side of the story. *See* RAMF No. 28.

When these factual questions are combined with Pelham's testimony, the court finds that – although a close question – there is evidence sufficient to allow a jury to reasonably reject Unipres' explanation and conclude that Unipres failed to make a reasonably informed and

16

considered decision sufficient to establish the applicability of the honest belief defense in this instance. Given this, Pelham has adequately rebutted (although not disproven) Unipres' stated non-discriminatory reason for the adverse employment action. The court further finds that Pelham has adduced sufficient evidence from which a reasonable jury could find that Unipres' stated reason for terminating Pelham was pretext for retaliation.

For these reasons, the court finds that Unipres is not entitled to summary judgment. The retaliation claim will proceed to trial along with the FLSA wage claim

## **CONCLUSION**

Unipres' Motion for Partial Summary Judgment (Docket No. 25 ) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge